UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ARCADIS U.S., INC.                               CIVIL ACTION NO. 20-0471

VERSUS                                           JUDGE S. MAURICE HICKS, JR.

STRYKER DEMOLITION &                             MAGISTRATE JUDGE HORNSBY
ENVIRONMENTAL SERVICES, LLC

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 50) filed by Defendant Stryker Demolition & Environmental Services, LLC ("Stryker"). Stryker seeks dismissal of all of Plaintiff Arcadis U.S., Inc.'s ("Arcadis") causes of action/claims: (1) failure to timely perform; (2) breach of contract for filing a lien; and (3) damages for wrongful filing of a lien. See id. Arcadis opposed the motion. See Record Document 60. Stryker filed a reply. See Record Document 70. For the reasons set forth below, Stryker's motion is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to the failure to timely perform cause of action but **DENIED** as to the causes of action relating to the lien.

**FACTUAL AND PROCEDURAL BACKGROUND**

This litigation arises from a large-scale demolition and abatement project ("the Project") in Shreveport, Louisiana. Arcadis entered into an agreement with Ansell Healthcare Products, LLC ("Ansell"), whereby Arcadis agreed to contract with a demolition contractor and supply project management for the demolition of the former battery manufacturing facility located at 6901 Westport Avenue in Shreveport, Louisiana. In addition to demolition, the Project also included disposal of lead and asbestos roofing

materials.  In accordance with a Services Agreement between Ansell and Arcadis, Arcadis formulated the bid specification package, solicited bids from contractors, performed contractor evaluations, and provided related services for the Project.

Arcadis prepared a request for proposals entitled "Work Plan – Environmental Removals and Demolition, Former Battery Manufacturing Facility, Shreveport, Louisiana" to solicit bids by contractors for the Project ("Request for Proposal").  Record Document 60-3.  The Request for Proposal was dated September 2018.  See id.  The Request for Proposal required that contractors submitting bids include a schedule detailing the planned start date and duration of the major tasks associated with the Project.  See id. at 16 (Section 6 Schedule) and 17 (Section 9 Submittals).

In response to the Request for Proposal, Stryker submitted to Arcadis a "Work Plan & Proposal" for the Project, dated November 2, 2018 and November 15, 2018.  See Record Document 50-3 at 10-58.  The Stryker Work Plan & Proposal referenced a kick-off meeting that would include a "schedule review" and project communication and reporting that included discussion of "schedule details" and "an overall schedule."  Id. at 8.  The Stryker Work Plan & Proposal also included a Project Implementation Schedule, stating "[w]e have provided a detailed draft project schedule broken down by task as per the RFP in Appendix C of our Work Plan."  Id. at 37-38.  Appendix C of the Stryker Work Plan & Proposal is a Proposed Schedule dated November 2, 2018.  See id. at 48-50.  This initial schedule included 101 workdays of on-site activities (approximately 20 weeks) and a completion date of April 24, 2019.  See id.  Stryker prepared revised schedules in early December 2018 and the duration of workdays of on-site activities increased to 111

days or approximately 22 weeks.  See Record Documents 60-3 at 89-96 and 60-5 at 4-9.

On December 11, 2018, Arcadis and Stryker entered into an "Agreement for Subcontractor Services" ("the Subcontract").  Record Document 50-3 at 1-9.  The Subcontract was an Arcadis standard contract and was created by Arcadis.  See Record Document 50-4 (Rule 30(b)(6) Arcadis Deposition - Kathryn "Katy" Brantingham[1]) at 94, 100.  More specifically, it was an Arcadis form document with fill in blanks.  See id. at 100.

The Subcontract did not represent a "Master" Subcontract Agreement.  Record Document 50-3 at 1 (upper left-hand corner).  Schedule A of the Subcontract contained "General Terms and Conditions."  Id. at 2.  Schedule A(1) was entitled "WORK/SERVICES" and provided, in pertinent part:

> Time is of the essence.  SUBCONTRACTOR agrees to commence and complete the Work in accordance with any schedule incorporated into this Agreement, or any duly executed Work Authorization, or any schedule submitted by SUBCONTRACTOR and otherwise accepted in writing by Arcadis.

Id. at 2.  Schedule A(29), entitled "ENTIRE AGREEMENT/AMENDMENTS," stated:

> This Agreement constitutes the entire agreement between the Parties with respect to the Work, and supersedes all prior negotiations, representations or agreements relating thereto, written or oral, except to the extent they are expressly incorporated herein. . . .  Any course or prior dealings or usage of the trade not expressly incorporated in this Agreement shall not be binding on either party.  The parties represent and warrant that each has had the opportunity to review and negotiate the terms of this Agreement, with the benefit of counsel if desired, and agree that any ambiguity shall not be construed against the drafter.

Id. at 6.

---

[1] Kathryn Brantingham ("Brantingham") testified that she was an Associate Vice-President, a project manager, and a client manager for Arcadis.  See Record Document 70-2 at 4.

Schedule B contained "Scope of Work/Basis of Compensation."  Id. at 8.  The Arcadis Project Manager was listed as Ryan Kelly ("Kelly") and the Arcadis PIC/Area Manager[2] was listed as Katy Brantingham.  See id.  Schedule B provided that additional information was attached:  "Stryker proposals 11/2/18, 11/15/18."  Id.  Under Project Schedule, the "Target Start Date" was listed as 12/11/18 and the "Required Completion Date" was listed as 12/31/19.  Id.  Kelly testified that his project assistant administrator, Liz Morris, entered the 12/31/19 required completion date.  See Record Document 50-5 (Deposition of Kelly) at 24-25.

Schedule F sets forth "SPECIAL PROVISIONS FOR CONSTRUCTION SERVICES."  Record Document 50-3 at 76-79.  Key sections include:

> SP-F6.  SITE CONDITIONS.
> SUBCONTRACTOR acknowledges that time is of the essence with respect to the performance and completion of its work under this Contract. SUBCONTRACTOR shall adhere to, commence and complete its work in accordance with any schedule incorporated into this Contract, or any schedule submitted by SUBCONTRACTOR or attached hereto . . . .
>
> . . .
>
> SP-F8.  DAMAGES FOR DELAYS; ADMINISTRATIVE COSTS; ACTUAL DAMAGES.
> Time is of the essence of the Contract. In the event the SUBCONTRACTOR fails to achieve Substantial Completion of the Work within the Contract Time or fails to meet any other time requirement or the time limit set forth in the Contract, after due allowance for any extension or extensions of time made in accordance with the provisions herein set forth, the SUBCONTRACTOR shall be liable for damages incurred by Arcadis as the result of SUBCONTRACTOR's performance failures.

Id. at 76-77.

---

[2] PIC refers to Principal in Charge or Area Manger.  See Record Document 70-2 at 6.

Stryker began its work on the Project on December 19, 2018. See Record Document 1-3 at ¶ 12; Record Document 68 (Declaration of Ryan Kelly) at ¶ 22. During the course of the Project, there were revisions to Stryker's project schedule. For instance, on January 28, 2019, there is email correspondence from Brian Hornyak at Stryker to Scot Lewis at Arcadis stating, "Attached is the last one [base project schedule] submitted I believe." Record Document 60-3 at 97-99. According to this revised schedule, on-site work would begin December 19, 2018 and be completed by June 3, 2019 – a duration of 111 workdays/approximately 22 weeks. See id. Revised schedules were emailed on February 10, 2019; February 11, 2019; March 13, 2019; March 14, 2019; and May 9, 2019. See id. at 100-105; see also Record Document 60-4 at 1-15. In the May 9, 2019 email, Mark F. Klotzbach, Sr., Stryker President ("Klotzbach"), transmitted a revised schedule showing final work activities would occur the week of June 17, 2019. See Record Document 60-4 at 15. Stryker substantially completed its work on the Project by July 26, 2019. See Record Document 1-3 at ¶ 13; Record Document 68 at ¶ 34.

In May 2019, Stryker submitted a change order request for additional contract price for work relating to removal of the hazardous roofing material. See Record Document 1-3 at ¶ 14. Arcadis rejected the change order request. See id. at ¶ 15. The Project was closed out on October 7, 2019. See id. at ¶ 17. The full contract price of $2,049,369 was paid to Stryker. See id.

On October 10, 2019, Stryker filed a Statement of Claim and Privilege, or mechanic's lien ("the Lien"), for $388,587.90 for "concealed conditions for the removal, transportation, and disposal of lead contaminated non-friable asbestos material." Record Document 1-2 at ¶ 18. The Lien was recorded in the mortgage records in Caddo Parish,

Louisiana. See id. It appears the Lien filed by Stryker was related to the rejected change order request and/or failure to render full payment for Stryker's additional services on the Project. See id. at ¶ 19; Record Document 50-2 at 15. On October 22, 2019, Arcadis demanded Stryker release and cancel the Lien. See Record Document 1-2 at ¶ 20. Stryker canceled the Lien on April 14, 2020, approximately one month after the instant suit was filed. See Record Document 50-7.

On November 18, 2019, Arcadis submitted a "Notice of Claim" to Stryker "for all additional costs incurred by Arcadis as a result of Stryker's delayed progress during project implementation at the Ansell Battery Plant demolition project." Record Document 60-4 at 23-24. The Notice of Claim was drafted by Kelly of Arcadis and transmitted to Klotzbach of Stryker. See id. The Notice of Claim stated that the actual project completion exceeded 150 working days. See id.

Litigation then ensued. Arcadis filed suit in state court on March 11, 2020. See Record Document 1. The suit was removed by Stryker to this Court on April 15, 2020. See id. Arcadis asserted three causes of action/claims: (1) breach of contract for failure to timely perform, (2) breach of contract for filing an improper lien, and (3) damages for the filing of said lien. See Record Document 1-2. Stryker's instant motion is directed towards these claims and seeks dismissal of the claims entirely.[3]

---

[3] In its Amended Counterclaim, Stryker asserted counterclaims for breach of contract, violation of the Louisiana Prompt Pay Statute, and fraud. See Record Document 88. Arcadis has filed motions seeking dismissal of Stryker's counterclaims. See Record Documents 55, 56, and 93.

## LAW AND ANALYSIS

**I.     Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). "Summary judgment is proper 'where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof. A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact.'" Geiserman v. MacDonald, 893 F.2d 787, 793 (5th Cir. 1990) (quoting Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir.1988)).

If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

Contract interpretation is a question of law. See UPI Semiconductor Corp. v. Int'l Trade Comm'n, 767 F.3d 1372, 1377 (Fed. Cir. 2014). If the interpretation of the language of a contract is the sole issue, then courts are likely able to resolve such matters on summary judgment because only questions of law are in controversy. See United Ass'n Loc. 38 Pension Tr. Fund v. Aetna Cas. & Sur. Co., 790 F.2d 1428, 1430 (9th Cir. 1986), amended, 811 F.2d 500 (9th Cir. 1987); Hall v. Malone, 12-0264 (La. App. 4 Cir. 11/7/12), 104 So.3d 593, 596 ("The interpretation of a contract's provisions is typically a matter of law that properly may be decided on motion for summary judgment."). In cases involving contractual ambiguity where there is relevant extrinsic evidence, courts must consider if "the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." Shepley v. New Coleman Holdings Inc., 174 F.3d 65, 72 n. 5 (2nd Cir. 1999).

**II.     Contractual Interpretation.**

The Civil Code instructs courts in the proper method of contract interpretation. See Landis Const. Co. v. St. Bernard Par., 2014-0096 (La. App. 4 Cir. 10/22/14), 151 So. 3d 959, 962–63, writ denied, 2014-2451 (La. 2/13/15), 159 So. 3d 467. "A contract constitutes the law between the parties." Id., citing La. Civil Code art. 1983. The interpretation of a contract is the determination of the common intent of the parties. See id., citing La. Civil Code art. 2045. "If the words of a contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the parties' true intent." Id., citing La. Civil Code Art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Id., citing La. Civil Code Art.

2050. "When a contract is not ambiguous or does not lead to absurd consequences, it will be enforced as written and its interpretation is a question of law for a court to decide." Id. "Meaning and intent of parties to a written instrument is ordinarily determined from the instrument's four corners and extrinsic evidence is inadmissible either to explain or to contradict the instrument's terms." Id.

"[T]he determination of whether a contract is clear or is ambiguous is also a question of law." Id. "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of the written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." Id.

### III. Analysis.

#### A. Claim Relating to Timely Performance.

Arcadis alleges that Stryker breached the Subcontract by failing to complete the Project by the agreed-upon substantial completion date. Arcadis submits that the Project was to be completed no later than June 3, 2019, but that the Project was not actually completed until July 19, 2018. Arcadis relies upon the estimated schedule(s) circulated by Stryker to establish the alleged substantial completion date. Notwithstanding the Project Schedule's Required Completion Date of December 31, 2019 set forth in Schedule B, Arcadis argues this date was simply to allow for any authorized change orders extending the Project duration and/or for Arcadis to issue additional work authorizations to Stryker relating to the Project site, if and as needed. Even with the December 31, 2019 date in place, Arcadis maintains that Stryker was required to complete the work for the Project in accordance with the schedules submitted by Stryker

and agreed to by Arcadis. In support of its position, Arcadis focuses on provisions of the Subcontract stating, "time is of the essence." Record Document 50-3 at 2, 76-77. Arcadis also points to Subsection SP-F6's site condition requirement that the subcontractor "adhere to, commence and complete its work in accordance with any schedule incorporated into this Contract, or any schedule submitted" and Subsection SP-F8's damages for delays requirement stating:

> In the event the SUBCONTRACTOR fails to achieve **Substantial Completion of the Work within the Contract Time or fails to meet any other time requirement or the time limit set forth in the Contract**, after due allowance for any extension or extensions of time made in accordance with the provisions herein set forth, the SUBCONTRACTOR shall be liable for damages incurred by Arcadis as the result of SUBCONTRACTOR's performance failures.

Id. at 76-77 (emphasis added).

Conversely, Stryker directs the Court to the plain language of the Subcontract, which identifies the Project Schedule's Required Completion Date as December 31, 2019. Stryker contends that Subsection SP-F8's damages for delay provision should not be read to require an earlier completion date since "substantial completion of work within the contract time" is not defined anywhere in the Subcontract. In fact, during the Rule 30(b)(6) deposition of Arcadis, Brantingham testified that she did not know if the required completion date was synonymous with the idea of a substantial completion date. See Record Document 70-2 at 6. Likewise, she could not explain what "substantial completion of the work within the contract time" meant. Id. at 8. Brantingham further testified:

> Q. Where in this document does it say the subcontractor shall provide a schedule, and you will be bound to complete this project according to that schedule?
>
> A. I wouldn't – I don't know.

> . . .
>
> Q.    Let me be a little bit more specific. If – there is a term in the contract called substantial completion. If you don't know what that means, how would Stryker know what that means?
>
> A.    I don't use this special detail, so I wouldn't know.

<u>Id.</u> at 8, 9. Stryker also notes that the Subcontract was not a "Master Subcontract Agreement," thus precluding Arcadis' apparent argument that the December 31, 2019 date applied to an overall "Master" subcontract agreement. This also discounts Arcadis' position that the December 31, 2019 date was simply to allow for any authorized change orders extending the Project duration and/or for Arcadis to issue additional work authorizations to Stryker relating to the Project site, if and as needed. Moreover, Subsection SP-F6's provisions apply to site conditions, not damages for delay. Stryker maintains that the actual provisions of the Subcontract and plain language of the Required Completion Date are unambiguous and must control. Yet, even if the Court considers provisions of the Subcontract to be ambiguous because of the lack of definitions of "substantial completion of work" and/or "contract time," then the Subcontract should be construed against Arcadis because it is a standard form contract and Arcadis is the party offering the form.

      Here, it is undisputed that Schedule B of the Subcontract establishes the Project Schedule's Required Completion Date of December 31, 2019. This is plain language and an explicit provision bearing on the precise issue in this motion. Brantingham testified in the Rule 30(b)(6) Arcadis deposition that she deferred to the actual language of the Subcontract as its contents. <u>See</u> Record Document 50-4 at 13. There is no genuine issue regarding this material fact.

However, even if the Court assumes ambiguity and/or conflict in the terms of the Subcontract, then it must employ longstanding interpretive canons. The controversy before the Court presents a legal—as opposed to factual—dispute which focuses entirely on textual interpretation of two provisions – the Project Schedule's "Required Completion Date" in Schedule B versus Subsection SP-F8's "Substantial Completion of the Work within the Contract Time." The Civil Code gives instruction on the means of supplying a resolution of the ambiguity:

> In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. Civil Code art. 2056. The Civil Code further directs that a contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.

Landis Const. Co., 151 So. 3d at 964. There is no factual dispute that the Subcontract was a standard form contract created by Arcadis. See Record Document 5-4 at 94, 100. It was a fill-in-the blank document. See id. at 100. Neither party has presented evidence that the Subcontract was jointly drafted or truly negotiated as to the standard provisions. Rather, the empty blanks were simply filled in. The Subcontract contains a provision stating, "the parties represent and warrant that each has had the opportunity to review and negotiate the terms of this Agreement, with the benefit of counsel if desired, and agree that any ambiguity shall not be construed against the drafter." Record Document 50-3 at 2 (Schedule A(29)). Yet, Arcadis has presented this Court with no case law indicating that the *contra proferentem* rule – a doctrine of contractual interpretation that has been embodied in Louisiana Civil Code Article 2056 – can be contracted away in an

instance where there was no joint drafting of the contract.[4]  Record Document 50-3 at 6. The Civil Code and policy considerations dictate otherwise.  Thus, the Court believes this is a case where the Civil Code impels an interpretation of the Subcontract against Arcadis because the Subcontract was an Arcadis standard form contract with fill-in blanks.  Landis Const. Co., 151 So. 3d at 964; see also 1A Bruner & O'Connor Construction Law § 3:87 (July 2022 update) ("When applied to standard agreements not authorized by either party, the rule is not so much "construed against the drafter," but construed against the party offering the form. . . .  Applying the *contra proferentem* rule to standard construction agreements occurs not because the agreements are deemed to be adhesion in nature, but because so many of the provisions were the product of simply selecting the form or drafting the plans and specifications, rather than of separate negotiations. In other words, there is little for standard contract analysis to latch onto in terms of what the parties actually intended with respect to many standard contract provisions. Of course, unlike

---

[4] "*Contra proferentem* usually requires that an interpreter read an ambiguous contract provision against the drafter of that provision."  Ethan J. Leib, Steve Thel, Contra Proferentem and the Role of the Jury in Contract Interpretation, 87 Temp. L. Rev. 773 (2015).  In considering whether *contra proferentem* is a mandatory or default rule, the authors of a Temple Law Review article explained:

> A mandatory rule. Like the rules of contract interpretation generally, [*contra proferentem* is a] mandatory rule[] that the parties cannot alter by contract. Some judicial opinions appear to enforce contract terms purporting to reject the application of the ordinary *contra proferentem* rule, but close analysis of some of those opinions reveals that **the contracts in question were jointly drafted by both parties, such that the *contra proferentem* rule would not have applied in any event, regardless of the presence or absence of a contract term purporting to reject the *contra proferentem* rule. If a term is jointly drafted, there can be no single drafter against whom to interpret any lingering ambiguity.**

Id. at 790 (emphasis added).

standard adhesion analysis, applying the rule of *contra proferentem* does require an initial finding that the contract language is ambiguous.").

With the contractual interpretative canons in mind, this Court believes the Subcontract's Required Completion Date of December 31, 2019 establishes the "Contract Time" as used in Subsection SP-F8 of Schedule F ("Substantial Completion of the Work within the Contract Time"). As argued by Stryker, Arcadis' tortured interpretation of the Subcontract would establish two possible substantial completion dates – one in June 2019 and another in December 2019. Any ambiguity is to be interpreted against Arcadis and this Court must conclude that Stryker's deadline to complete the Project was the latter of the two dates, that is, December 31, 2019. Accordingly, based on the foregoing rationale, summary judgment in favor of Stryker is **GRANTED** as to timely performance. Under the Subcontract, Stryker was obligated to complete its work on the Project by December 31, 2019. Stryker completed its work on the Project no later than July 26, 2019 and complied with the December 31, 2019 required completion date. Arcadis' claim for breach of contract for failure to timely perform is **DISMISSED**.

**B.     Claims Relating to the Lien.**

Arcadis alleges that Stryker breached the Subcontract by filing a lien against the Project site owned by Ansell. See Record Document 1-2 at ¶ 32. Arcadis contends that Stryker waived its right to file a lien against the property and is in breach of Subcontract for doing so. There are two provisions of the Subcontract bearing on this issue: (1) Section 10 of Schedule A and (2) Subsection SP-F3 of Schedule F. See Record Document 50-3 at 4, 76. Section 10 of Schedule A - General Terms and Conditions provides:

> Liens.
> SUBCONTRACTOR shall promptly pay for all services, materials, equipment and labor used or furnished by SUBCONTRACTOR in the performance of the Work, and shall, at SUBCONTRACTOR'S expense, keep all property belonging to Arcadis and Client or either of them free and clear of any and all liens and rights of lien arising out of services, labor, equipment, or materials furnished by SUBCONTRACTOR or its employees, material men or sub-subcontractors in performance of the Work.  If SUBCONTRACTOR fails to release and discharge any such claim or lien on the property of Arcadis and Client or either of them within seven (7) days after receipt of written notice from Arcadis to remove such claim or lien, Arcadis may, at its option, discharge or release the lien or claim of lien or take such other action with respect to the lien as Arcadis may deem appropriate.  SUBCONTRACTOR shall pay Arcadis any and all costs and expenses incurred by Arcadis in so doing (including reasonable attorney's fees), and Arcadis may deduct this amount from the Subcontract costs. SUBCONTRACTOR shall, at its own expense, defend any action based on such claim or lien, and shall pay and satisfy any judgment which may be established by decision of the court.

Id. at 4.  Subsection SP-F3 of Schedule F – Special Provisions for Construction Services provides:

> . . .
>
> SUBCONTRACROR shall not permit any lien or charge to be fixed, filed, or other assessed against Arcadis, the Client, or the Site.
>
> To the extent permitted by law, SUBCONTRACTOR waives its right to file any lien, including mechanic liens, relating to the Work, shall not enter into any agreement establishing such a right in any other party and shall keep the Site free from all liens by others.  Should any claim of lien be recorded by the SUBCONTRACTOR, any SUBCONTRACTOR, or material-man of the SUBCONTRACTOR, SUBCONTRACTOR shall, within two (2) days of the recording of such lien, obtain a transfer bond transferring the lien to the bond at the SUBCONTRACTOR's cost.  If the SUBCONTRACTOR fails to do so, the Client or Arcadis may take such steps as are necessary to transfer such liens to bond or otherwise protect the Site from liens, and the SUBCONTRACTOR shall reimburse the Arcadis or Client for such expenses, including reasonable attorneys' fees.  Arcadis may withhold and deduct any such amounts from any payment to the SUBCONTRACTOR.
>
> . . .

<u>Id.</u> at 76. Arcadis further alleged that the Lien was both deficient and untimely pursuant to the Louisiana Private Works Act because it was filed more than sixty (60) days after the date of substantial completion. <u>See</u> La. R.S. 9:4822(C) and La. R.S. 9:4822(H).[5]

In its summary judgment motion, Stryker seeks dismissal of the causes of action based on the Lien because "Stryker canceled the lien on April 14, 2020." Record Document 50-2 at 15. Arcadis "does not expound upon the damages it allegedly suffered as a result of the filing of the lien" and has "produced in discovery no evidence of any damages [Arcadis] allegedly sustained as a result of the lien, which was canceled by

---

[5] Section 4822(C) provides "a general contractor to whom a privilege is granted . . . shall file a statement of his privilege no later than . . . [s]ixty days after the filing of a notice of termination of the work." La. Stat. Ann. § 9:4822. Section 4822(H) provides that "[a] statement of a claim or privilege:

(1) Shall be in writing.

(2) Shall be signed by the person asserting the same or his representative.

(3) Shall contain a reasonable identification of the immovable with respect to which the work was performed or movables or services were supplied or rendered.

(4) Shall set forth the amount and nature of the obligation giving rise to the claim or privilege and reasonably itemize the elements comprising it including the person for whom or to whom the contract was performed, material supplied, or services rendered. The provisions of this Paragraph shall not require a claimant to attach copies of unpaid invoices unless the statement of claim or privilege specifically states that the invoices are attached.

(5) Shall identify the owner who is liable for the claim under R.S. 9:4806(B), but if that owner's interest in the immovable does not appear of record, the statement of claim or privilege may instead identify the person who appears of record to own the immovable.

<u>Id.</u>

Stryker." Id. Thus, Stryker argues Arcadis' two causes of action relating to the Lien are now moot. See id.

In response, Arcadis notes that Stryker filed the Lien after it had been paid the full contract price and even though it waived its lien rights under Subsection SP-F3 of the Subcontract. See Record Document 60 at 20-21. Arcadis further submits that no backup documentation or itemization of the claimed costs was provided with the Lien; no written or verbal notice was provided from Stryker to Arcadis; and the Lien amount of $388,587.90 was an increase from Stryker's change order request. See id. at 21. Under the Subcontract and La. R.S. 9:4833(B),[6] Arcadis argues it can recover damages and attorney's fees for Stryker's deficient and untimely Lien. See Perkins v. Standard Oil Co. of Cal., 399 U.S. 222, 223 (1970) ("The amount of the award for such [legal] services should, as a general rule, be fixed in the first instance by the District Court, after hearing evidence as to the extent and nature of the services rendered."); King v. McCord, 621 F.2d 205, 206 (5th Cir. 1980) (reasonableness of attorney's fees is a factual issue to be determined at an evidentiary hearing). Arcadis maintains there are genuine issues of material fact as to the amount of attorney's fees and costs owed to it for Stryker's wrongful filing of its Lien.

In reply, Stryker simply stated, "Arcadis has not produced proof of such damages in either discovery or in response to Stryker's motion for summary judgment." Record Document 70 at 7.

---

[6] Section 4833(B) provides that "[o]ne who, without reasonable cause, fails to deliver a written request for cancellation in proper form to cancel the claim or privilege as required by Subsection A of this Section shall be liable for damages suffered by the owner or person requesting the authorization as a result of the failure and for reasonable attorney fees incurred in causing the statement to be cancelled." La. Stat. Ann. § 9:4833.

The instant motion is **DENIED** at this stage as to the causes of action related to the Lien. Stryker has identified the provisions of the Subcontract and Louisiana law that could potentially allow for attorney's fees and costs in this instance; yet, there remain genuine issues of material fact relating to the contents of the Lien, waiver, and the amount of attorney's fees and costs possibly owed. The Court would also like additional argument from and discussion with counsel at the upcoming pretrial conference as to whether the causes of action/claims relating to the Lien could be resolved separately from any trial on the merits, possibly in an evidentiary hearing or motion practice after any trial record is made.

## CONCLUSION

For the reasons stated above, Stryker's Motion for Summary Judgment (Record Document 50) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to the failure to timely perform cause of action but **DENIED** as to the causes of action relating to the Lien.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 29th day of June, 2023.

_____
United States District Judge