UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| ARCADIS U.S., INC. | CIVIL ACTION NO. 20-0471 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| STRYKER DEMOLITION & ENVIRONMENTAL SERVICES, LLC | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court are two Motions for Partial Summary Judgment (Record Documents 55 and 56) filed by Plaintiff and Defendant-in-Counterclaim, Arcadis U.S., Inc.'s ("Arcadis"). In the first motion, Arcadis seeks dismissal of Defendant and Counterclaimant, Stryker Demolition & Environmental Services, LLC's ("Stryker") breach of contract counterclaims relating to removal of roofing material, removal of sludge from tanks, draining and backfilling of subsurface vaults and holes, and costs incurred due to a threatened shooter on the Project. See Record Document 55. In the second motion, Arcadis seeks dismissal of Stryker's breach of contract counterclaim relating to the removal of additional concrete on the Project. See Record Document 56. Stryker opposed both motions. See Record Document 64 and 65. Arcadis replied. See Record Documents 72 and 73. For the reasons set forth below, Arcadis's motions are **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

This litigation arises from a large-scale demolition and abatement project ("the Project") in Shreveport, Louisiana. Arcadis entered into an agreement with Ansell Healthcare Products, LLC ("Ansell"), whereby Arcadis agreed to contract with a demolition contractor and supply project management for the demolition of the former

battery manufacturing facility located at 6901 Westport Avenue in Shreveport, Louisiana. In addition to demolition, the Project also included disposal of lead and asbestos roofing materials. In accordance with a Services Agreement between Ansell and Arcadis, Arcadis formulated the bid specification package, solicited bids from contractors, performed contractor evaluations, and provided related services for the Project.

In October 2018, interested bidders, including Stryker, attended two site visits ("Bid Walks"). Arcadis maintains that during the Bid Walks, the prospective bidders observed layers of roofing material from the exposed, fire-damaged portions of the roof. According to Stryker, following the Bid Walks, the prospective bidders were permitted to submit questions to Arcadis seeking further information and clarification as to the Project requirements and site conditions. Thereafter, three bids were submitted for the Project, with Stryker's bid as the lowest, responsive bid.

In response to the Request for Proposal, Stryker submitted to Arcadis a "Work Plan & Proposal" for the Project, dated November 2, 2018 and November 15, 2018. See Record Document 56-5 at 10-58. On December 11, 2018, Arcadis and Stryker entered into an "Agreement for Subcontractor Services" ("the Subcontract"). Id. at 1-79. Schedule A (General Terms and Conditions) of the Subcontract provided:

> 6.   CHANGES.
>
> No changes to this Agreement and no extra charges will be allowed unless a duly authorized representative of Arcadis specifically agrees to them in ***writing***. As a condition precedent to SUBCONTRACTOR's recovery on any claim for an increase in the cost of the Work or for an extension of time to complete the Work (a "Claim"), SUBCONTRACTOR shall, ***immediately after the occurrence of the event which SUBCONTRACTOR believes may give rise to a Claim, give Arcadis written notice of the claim, which notice shall contain a verified statement that supports the claim and details the estimated change in the Subcontract cost and the time to complete the Work***. SUBCONTRACTOR's failure to provide notice as

> required by this paragraph shall be a ***waiver*** of SUBCONTRACTOR's right to recovery under the terms of the Prime Contract between Arcadis and its Client on a Claim.  In no event shall SUBCONTRACTOR be entitled to compensation for changes which are not reimbursable to Arcadis by its Client.  In no event shall SUBCONTRACTOR be entitled to any reverse liquidated damages, charges, other expenses incurred by SUBCONTRACTOR by reason of delays in the performance of the Services, caused by Arcadis or its Client.  Any determination by Arcadis or Client with regard to same shall be binding upon SUBCONTRACTOR.

Record Document 55-4 at 3 (emphasis added).[1]

Stryker began its work on the Project on December 19, 2018.  See Record Document 1-2 at ¶ 12.  Sometime in February or March 2019, Stryker discovered there were two roofing systems.  See Record Document 55-6 (Deposition of Mark Klotzbach, Sr.) at 337.  On May 14, 2019, Stryker submitted a Change Order Request ("COR") for additional contract price for work relating to the unanticipated weight of hazardous roofing material removed from the site that Stryker alleges it did not account for in its bid.  Arcadis rejected the COR because the subject request for proposals and Subcontract stated that all transportation and disposals costs were to be included in Stryker's bid amount and that Stryker would assume the risk of all site conditions.

The Project was closed out on October 7, 2019.  See Record Document 1-2 at ¶ 17.  The full contract price of $2,049,369 was paid to Stryker.  See id.  On October 10, 2019, Stryker filed a Statement of Claim and Privilege, or mechanic's lien ("the Lien"), for $388,587.90 for "concealed conditions for the removal, transportation, and disposal of lead contaminated non-friable asbestos material."  Record Document 1-2 at ¶ 18.  The Lien was recorded in the mortgage records in Caddo Parish, Louisiana.  See id.  On

---

[1] The Prime Contract referenced in Schedule A(6) refers to the Services Agreement between Ansell and Arcadis.  The Subcontract expressly incorporated the terms and conditions of the Prime Contract.  See Record Document 55-4 at 1.

October 22, 2019, Arcadis demanded Stryker release and cancel the Lien. See Record Document 1-2 at ¶ 20. Stryker canceled the Lien on April 14, 2020. On November 18, 2019, Arcadis submitted a Notice of Claim to Stryker for all additional costs incurred by Arcadis as a result of Stryker's delayed progress during project implementation at the Ansell Battery Plant demolition project. The Notice of Claim stated that the actual project completion exceeded 150 working days. See id.

Litigation then ensued. Arcadis filed suit in state court on March 11, 2020. See Record Document 1. The suit was removed by Stryker to this Court on April 15, 2020. See id. Arcadis asserted three causes of action/claims: (1) breach of contract for failure to timely perform, (2) breach of contract for filing an improper lien, and (3) damages for the filing of said lien. See Record Document 1-2. Stryker's motion seeking dismissal of these claims was granted in part and denied in part. See Record Documents 103 and 104. The motion was granted as to the failure to timely perform claim but denied as to the claims relating to the Lien. See id.

In its Amended Counterclaim, Stryker asserted counterclaims for breach of contract and fraud. See Record Document 88. The fraud counterclaim was dismissed by this Court on July 5, 2023. See Record Documents 105 and 106. The instant motions seek dismissal of the breach of contract counterclaims. See Record Documents 55 and 56. The first set of breach of contract counterclaims relate to additional costs regarding the removal of roofing material ($470,604.63), the removal of sludge from tanks ($9,784.80), the draining and backfilling of subsurface vaults and holes ($14,729.87), and a threatened shooter on the Project ($16,874.17). See Record Document 55; see also Record Document 88 at ¶¶ 50-80, 87-98. Arcadis argues Striker failed to follow the

Subcontract and did not give immediate written notice to Arcadis regarding these claims, thereby waiving such claims. See Record Document 55. The second set of breach of contract counterclaims relates to additional costs incurred ($109,429) to remove excessively thick concrete on the Project. See Record Document 56; see also Record Document 88 at ¶¶ 82-86. Arcadis seeks dismissal of the concrete claims on the ground that it did not agree in writing (or otherwise) to Stryker's COR for the alleged additional concrete work. See Record Document 56.

## LAW AND ANALYSIS

**I.    Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). "Summary judgment is proper 'where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof. A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact.'" Geiserman v. MacDonald, 893 F.2d 787,

793 (5th Cir. 1990) (quoting Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir.1988)).

If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir. 2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir. 1993).

Contract interpretation is a question of law. See UPI Semiconductor Corp. v. Int'l Trade Comm'n, 767 F.3d 1372, 1377 (Fed. Cir. 2014). If the interpretation of the language of a contract is the sole issue, then courts are likely able to resolve such matters on summary judgment because only questions of law are in controversy. See United Ass'n Loc. 38 Pension Tr. Fund v. Aetna Cas. & Sur. Co., 790 F.2d 1428, 1430 (9th Cir. 1986), amended, 811 F.2d 500 (9th Cir. 1987); Hall v. Malone, 12-0264 (La. App. 4 Cir. 11/7/12), 104 So.3d 593, 596 ("The interpretation of a contract's provisions is typically a matter of law that properly may be decided on motion for summary judgment."). In cases involving contractual ambiguity where there is relevant extrinsic evidence, courts must consider if "the extrinsic evidence creates no genuine issue of material fact and permits interpretation

of the agreement as a matter of law." Shepley v. New Coleman Holdings Inc., 174 F.3d 65, 72 n. 5 (2nd Cir. 1999).

## II. Contractual Interpretation and Construction Contract Principles.

The Civil Code instructs courts in the proper method of contract interpretation. See Landis Const. Co. v. St. Bernard Par., 2014-0096 (La. App. 4 Cir. 10/22/14), 151 So. 3d 959, 962–63, writ denied, 2014-2451 (La. 2/13/15), 159 So. 3d 467. "A contract constitutes the law between the parties." Id., citing La. Civil Code art. 1983. The interpretation of a contract is the determination of the common intent of the parties. See id., citing La. Civil Code art. 2045. "If the words of a contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the parties' true intent." Id., citing La. Civil Code Art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Id., citing La. Civil Code Art. 2050. "When a contract is not ambiguous or does not lead to absurd consequences, it will be enforced as written and its interpretation is a question of law for a court to decide." Id. "Meaning and intent of parties to a written instrument is ordinarily determined from the instrument's four corners and extrinsic evidence is inadmissible either to explain or to contradict the instrument's terms." Id.

"[T]he determination of whether a contract is clear or is ambiguous is also a question of law." Id. "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of the written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." Id.

Louisiana law "is clear that written construction contracts may be modified by oral contracts and the conduct of the parties even when the written contract contains a provision that change orders must be in writing." Rhodes Steel Bldgs., Inc. v. Walker Const. Co., 35,917 (La. App. 2 Cir. 4/3/02), 813 So. 2d 1171, 1177, *citing* Wisinger v. Casten, 550 So.2d 685 (La.App. 2d Cir.1989); Capitol Nursing Home, Inc. v. Nixon, 99–0378 (La.App. 1st Cir. 3/31/00), 764 So.2d 1016, *writ denied*, 2000–1234 (La. 6/16/00), 765 So.2d 336; Gill Const. Co., Inc. v. Purnell Const. Co., Inc., 99–1979 (La.App. 4th Cir. 3/15/00), 756 So.2d 1183; Gravier Co. v. Satellite Business Systems, 519 So.2d 180 (La.App. 4th Cir.1987), *writ denied*, 521 So.2d 1150 (La. 1988); Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1 (La.App. 4th Cir.1982), *writ denied*, 423 So.2d 1150 (La. 1982); Grossie v. Lafayette Const. Co., Inc., 306 So.2d 453 (La.App. 3d Cir.1975), *writ denied*, 309 So.2d 354 (La.1975). "It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract." Pelican Elec. Contractors, 419 So.2d at 5.

**III.   Analysis.**

    **A.   Motion for Partial Summary Judgment Relating to Roofing Material, Sludge, Vaults, Holes, and Threatened Shooter (Record Document 55).**

Arcadis seeks dismissal of these claims, arguing Striker failed to follow the Subcontract and did not give proper notice to Arcadis pursuant to Schedule A(6), thereby waiving such claims. See Record Document 55. As to the alleged costs incurred by Stryker for removal of sludge from tanks, draining and backfilling of subsurface vaults and holes, and in relation to the threated shooter on the Project, Arcadis submits that Stryker failed to give any written notice, much less immediate, verified written notice. As to the additional costs for removing roofing materials, Arcadis maintains that "while Stryker gave

written notice of its requested change order . . ., such notice was untimely under the Subcontract." Record Document 55-1 at 13. Arcadis bases this argument on Schedule A(6)'s requirement that the "SUBCONTRACTOR shall, immediately after the occurrence of the event which SUBCONTRACTOR believes may give rise to a Claim, give Arcadis written notice of the claim, which notice shall contain a verified statement that supports the claim and details the estimated change in the Subcontract cost and the time to complete the Work." Record Document 55-4 at 3. Arcadis points to Mark Klotzbach's[2] deposition testimony that Stryker knew in February or March 2019 that it made incorrect assumptions regarding the number of roofing systems for the Project and that the total weight of the roofing material increased due to its saturation. See Record Document 55-6 at 337. Yet, Stryker did not inform Arcadis about the potential claim until May 2019. See Record Document 55-3. Arcadis argues this delay in sending notice precludes recovery by Stryker for additional costs for removing the roofing material.

In response, Stryker points to the legal principle pursuant to Louisiana law that written construction contracts may be modified by oral contracts and the conduct of the parties even when the written contract contains a provision that change orders must be in writing. See Rhodes Steel Bldgs., Inc., 813 So.2d at 1177. It also argues there are ambiguous and conflicting provisions in the Subcontract and Prime Contract that can only coexist in light of the aforementioned legal principle. Based on these arguments, Stryker submits that the instant motion should be denied as a matter of law. Additionally, Stryker points to the deposition testimony of John Trahan, an Arcadis construction manager who

---

[2] Mark Klotzbach, Sr. was Stryker's President and Program Manager. See Record Document 55-4 at 45.

was present on the Project site almost every day; Ralph Rutland, a Stryker project supervisor; and Mark Klotzbach as summary judgment evidence demonstrating genuine disputes of material fact regarding whether there were oral agreements and/or conduct of the parties that modified the Subcontract, namely modifying the written – versus oral – notice requirement for change orders/additional costs.  See Record Document 65 at 14-16; Record Document 65-11 (Deposition of John Trahan); Record Document 65-12 (Deposition of Ralph Rutland); and Record Document 65-13 (Deposition of Mark Klotzbach).  As stated previously, it is a question of fact as to whether there are oral agreements or conduct of parties that may have modified the written construction contracts in this matter.  See Pelican Elec. Contractors, 419 So.2d at 5.  Thus, this Court believes it is for the trier of fact to determine if any of the notice provisions of the Subcontract or the Prime Contract regarding change orders, additional changed conditions, and/or additional costs were modified by oral agreements or the conduct of the parties.[3]  Arcadis's Motion for Partial Summary Judgment (Record Document 55) as to Stryker's breach of contract counterclaims relating to the removal of roofing materials, the removal of sludge from tanks, the draining and backfilling of subsurface vaults and holes, and in relation to the threated shooter on the Project is, therefore, **DENIED**.

---

[3] Louisiana Civil Code Article 1846 provides that when a writing is not required by law or a contract is not reduced to writing, "if the price or value is in excess of five hundred dollars, [then] the contract must be proved by at least one witness and other corroborating circumstances."  Pursuant to this rule, "only general corroboration is required" and "it is not necessary that plaintiff offer independent proof of every detail."  Peter Vicari Gen. Contractor, Inc. v. St. Pierre, 02-250 (La. App. 5 Cir. 10/16/02), 831 So.2d 296, 301.

### B. Motion for Partial Summary Judgment Relating to Concrete (Record Document 56).

Arcadis argues that Stryker is not entitled to any extra charges or costs under its requested change orders relating to alleged additional concrete work because such work was not agreed to in writing by Arcadis as required by the Subcontract.  Arcadis admits that during the of the course of the work under the Subcontract, Stryker encountered concrete that was greater than 8 inches in depth and up to 22 inches in thickness that protruded above the finish grade level.  Yet, there is a dispute as to whether Stryker removed such concrete at the direction of Arcadis or removed such concrete despite being told to leave it in place until a path forward could be defined.  <u>See</u> Record Document 64-2 (Deposition of Mark Klotzbach) versus Record Document 56-8 (Email Chain between Arcadis and Stryker Employees).  Arcadis has submitted a May 28, 2019 email from Ryan Kelly, Arcadis's Certified Project Manager, to Brian Hornyak and others with Stryker, stating:

> Please, let's leave any of the areas [of concrete] that are in question until we discuss and define a path forward.

Record Document 56-8.  Yet, Stryker has presented the deposition testimony of Mark Klotzbach, wherein he testified:

> A. Ryan Kelly and John Trahan told us to finish taking up the concrete and grade it to get the grade so we didn't have ponding.
>
> Q. Okay. Did anyone ever tell you to remove concrete which was greater than twelve inches in depth?
>
> A. Yes, they told us to remove the concrete that was going to be sticking up and interfering with the grading above the grade lines, the final grade line.

Record Document 64-2 at 381.  Thus, as argued by Stryker, there are genuine issues of material fact regarding whether Arcadis orally directed Stryker to perform additional work to remove a concealed concrete condition and thus modified any contract requirements requiring written approval of change orders.  See <u>Pelican Elec. Contractors</u>, 419 So.2d at 5 (holding it is a question of fact whether oral agreements or conduct of parties may have modified written construction contracts).  Thus, Arcadis's Motion for Partial Summary Judgment (Record Document 56) as to Stryker's breach of contract counterclaims relating to additional concrete work must also be **DENIED**.

## CONCLUSION

For the reasons stated above, Arcadis's Motions for Partial Summary Judgment (Record Documents 55 and 56) are **DENIED**.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 6th day of July, 2023.

_____
United States District Judge